**STATE of Missouri, Respondent,**

v.

**Eli BOLDEN, Appellant.**

**No. 56352.**

Supreme Court of Missouri,
Division No. 2.

Feb. 22, 1972.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Alfred I. Harris, St. Louis, for appellant.

DONNELLY, Judge.

Appellant, Eli Bolden, was convicted of attempted arson under V.A.M.S. §§ 560.035 and 560.020 by a jury in the Circuit Court of the City of St. Louis, Missouri, and his punishment under the provisions of V.A.M.S. § 556.280 was assessed at imprisonment for a term of "three and a half years." Following rendition of judgment and imposition of sentence an appeal was perfected to this Court.

The only point raised on appeal is that "the State failed to sustain its burden of proof or to make a prima facie case."

*Herbert Singer testified as follows:*

"Q  Mr. Singer, what is your occupation or business?

A  Merchant.

Q  Merchant of what, sir?  A  Tobacco and liquor store.

Q  You have a tobacco and liquor store? A  Yes, sir.

Q  And where is that store located? A  5902 Delmar.

Q  Is that within the City of St. Louis, Missouri?

A  Yes, sir.

\*    \*    \*    \*    \*    \*

Q  Now, you were working yourself in the shop on May 29, 1969, is that correct? A  Yes, sir.

Q  What time did you close up? A  Ten P.M."

*Thomas Godfrey testified as follows:*

"Q  Will you state your name, please?

A  Thomas Godfrey.

Q  And what is your occupation? A  Police Officer.

Q St. Louis Metropolitan Police Department? A Yes.

\* \* \* \* \* \*

Q Directing your attention to very late hours on May 29th, 11:45, thereabouts, would you tell us where your duty took you?

A We were assigned to Seventh, riding in Seventh District area.

\* \* \* \* \* \*

Q Just continue to tell us, officer, what occurred as you approached Delmar Boulevard, not relating what someone else told you?

A Okay. As we approached Delmar and Hamilton, we observed in front of 5902 Delmar approximately eight to nine Negro youths couched in what appeared to me in a sitting or kneeling position, and in front of these Negro youths were approximately eight to nine soda bottles.

\* \* \* \* \* \*

Q Were the bottles standing on the sidewalk? A Yes.

Q Did you observe anything unusual about the bottles?

A Yes, I did.

Q What?

A The bottles contained an amber colored fluid and each bottle had a rag type of wick sticking out of the neck.

Q Sticking out of the neck of the bottle? A Yes.

Q Tell us what you did then?

A At that time we alighted from the police car and we began to approach the subjects in front of 5902 Delmar.

\* \* \* \* \* \*

Q Were you in uniform? A We were.

Q What happened then?

A They all got up and began to run.

Q Did anything unusual occur at that time? A Yes.

Q Will you tell us what happened?

A One of the subjects in the group threw a rock through this particular window at 5902 Delmar.

\* \* \* \* \* \*

Q All right. Were you able to see the man who threw the rock? A Yes.

Q Did you get a good look at him? A Yes.

Q Do you see him anywhere here in the courtroom?

A I do.

Q Where do you see him, Officer? A Right there (indicating).

Q You are indicating the man in the light yellow striped shirt seated next to his counsel at counsel table? A I am.

Q And that's the man you observed throw the rock? A Yes.

Q Did the rock hit the window? A Yes.

Q Did the window break? A Yes.

Q Tell me this. What else, if anything, did you observe?

A Well, after the window was broken, this same person who threw the rock then attempted to throw one of these soda bottles with the amber colored——

MR. HARRIS: I object to the conclusion, and let him describe what he did.

THE COURT: Well, that's a word of description, counsel. Overruled.

Q Did he attempt to throw it? A Yes.

Q Did he throw it? A Yes.

Q Did he release the bottle? A Yes.

Q What happened?

A The bottle struck a metal strip, I imagine the glass is held in place with, and it broke and fell to the ground.

Q Fell down. Did it fall inside or outside?

A It fell outside.

Q On the sidewalk? A Yes.

Q All concrete there? A Yes.

Q No lawn or grass there? A No.

Q Did this bottle—you say, it had one of the cloths or rags? A It had like a rag type wick."

*Lester Ficke testified as follows:*

"Q Will you state your name, please?

A Lester Ficke.

Q And what is your occupation? A Police officer.

Q St. Louis Metropolitan Police Department?

A That's correct.

Q And you are a detective? A Yes.

Q How long have you been with the Police Department?

A Twenty-eight years.

Q Were you so employed on May 29, 1969? A Yes, sir.

Q What was your assignment on that date, what squad or division were you attached to? A Homicide Arson.

\* \* \* \* \* \*

Q All right. Directing your attention to about midnight on May 29th, will you tell us where your duty took you?

A Well, about twelve, about twelve thirty or twelve fifteen, I was directed to 5902 Delmar.

Q And did you go to 5902 Delmar? A I did.

Q And when you got there, what did you find, Officer?

A I found a—I met a police officer who was involved in an arson case.

Q Who was the police officer? A I don't recall.

MR. HARRIS: If he knows.

Q If you know his name. But there was a police officer there? A Yes.

Q And will you tell us this, Detective. Just what you did observe about this arson case you mentioned?

A I observed the windows or the window in the Chester Pipe Shop located at 5902 Delmar had been broken—a hole in it I imagine, it was about eighteen by eighteen.

Q Hole in the window?

A And there were several soda bottles setting at the curb, and there was another soda bottle lying just in front of this window which was broken.

Q All right. Can you tell us, did you examine those soda bottles? A I did.

Q There where you found them? A Yes.

Q What did you find, officer? A I found gasoline.

Q Where did you find the gasoline? A In the soda bottles.

\* \* \* \* \* \*

Q Well, Officer, the bottles you found there, six at the curb and one broken up at the building. What did you do with those?

A I brought those in the office of the Bomb and Arson Section and drained the gasoline out for safety measures and held the contents for Lab.

Q Did you hold part of the contents in each bottle?

A Yes.

Q What did you put the contents into?

A Small containers, about a pint jar.

\* \* \* \* \* \*

Q Officer, there is one—this bottle is a part of Exhibit Two. Will you take a look at that bottle, please? A Yes.

Q Can you tell us anything about the condition of the bottle?

A This is a Cocola bottle with neck broken, a sixteen ounce bottle, this is the one found near the window on the outside setting on the sidewalk.

Q Did it have that wick in it at that time? A Yes, sir.

Q Did you have occasion to smell or sniff that bottle at the time you picked it up? A Yes.

Q Could you tell us anything about any odor you might have detected? A Yes, sir.

Q What? A Gasoline.

Q Would you take a look at the wick in that bottle. Can you tell us anything about that?

A This wick, this particular bottle here, this wick has a small, shows a small burning on this wick.

Q You are indicating this scorched area on the end of the wick. That is the end of the wick hanging free from the bottle?

A Yes.

Q Was that scorched area of the wick there when you found the bottle?

A It was in the bottle like this (indicating).

Q Detective, I'm going to hand you what has been marked for identification purposes State's Exhibit Number 6. Will you take a look at it and tell us what that is, please?

A This is a portion of gas I had taken from the bottles on the sidewalk.

Q How can you be sure that's the gasoline from the bottles?

. A I poured it from the bottles myself into this jar."

*Marilyn Ruemmler testified as follows:*

"Q Will you state your name, please? A Marilyn Ruemmler.

Q Speak up, please, so the jury can hear you, and the Court. What is your occupation?

A I'm employed as a criminalist at the St. Louis Police Department Laboratory.

* * * * * *

Q Mrs. Ruemmler, directing your attention to May 30, 1969, can you tell us, were you on duty on that date? A Yes, I was.

Q In the Police Laboratory? A Yes.

Q Just for the jury's sake, there is a laboratory operated by the Police Department of the City of St. Louis?

A Yes. That's correct.

Q And you are one of the people employed there to make various technical examinations of materials and evidence brought to you? A Yes.

Q Chemical and otherwise? A Yes.

Q And counsel has stipulated your qualifications. I am going to hand you what has been marked State's Exhibit Number 6. Will you tell us if you have ever seen that before? A Yes, I have.

* * * * * *

Q All right. Will you tell us this, Mrs. Ruemmler, did you have occasion to make an analysis of the content of that or tests of that content of that jar? A Yes.

* * * * * *

Q Very well. Will you tell us the result of that analysis?

A I found the jar to contain gasoline.

Q Gasoline? A Yes.

Q All right. Now, will you tell us in your professional opinion is that a combustible material? A Yes, it is.

Q Let me ask you this, Mrs. Ruemmler. A bottle filled with or had gasoline in it with an ignited wick in the bottle and

was placed against or thrown against a building, would it or could it set fire?

MR. HARRIS: I object, your honor, to that—as being hypothetical falls short of a hypothetical question.

THE COURT: Do you want to supply anything to the hypothetical question?

MR. HARRIS: Not at this point.

THE COURT: All right. Will be overruled.

Q Would that be likely to cause or set a fire?

A Yes. The possibilities are very great."

We find the evidence sufficient to sustain the conviction. Cf. State v. Porter, Mo.Sup., 458 S.W.2d 256; State v. Lamb, Mo.Sup., 468 S.W.2d 209.

The judgment is affirmed.

MORGAN, P. J., HENLEY, J., and SMITH, Special Judge, concur.